Eli Lilly v. Teva Pharmaceuticals, 2020, 1876, 77, and 78. Mr. Rich. Thank you, Your Honor. May it please the Court. The Board committed three legal errors which led it to conclude there was no reasonable expectation of success in using the claimed antibodies for the very purpose that the prior Art identified as a reason to pursue them, treatment of migraine. I'd like to start by reasonable expectation of success for achieving clinical results that the parties and the Board agree are not required by Teva's claimed preambles. The Board expressly held at Appendix 16 that the preamble does not require achieving a result, but just two pages later, the Board reached the contrary conclusion that the preamble required a reasonable expectation that performing the recited method would bring about the recited result, a result that's not required by the preamble. Well, if the claims recite an effective amount, doesn't that mean it's going to be effective for something which requires that the preamble be meaningful? No, Your Honor. I think that's wrong for at least three reasons. First of all, as this Court held in Alcon and Bristol-Myers and Copaxone, an effective amount term just refers to some amount of a drug. It does not describe a result or require a showing of clinical efficacy. And Teva hasn't cited any contrary authority. While Teva cites to the definition of effective amount in the specification, that definition merely requires an amount sufficient to affect the desired result, not that the result is achieved. And indeed, that definition states expressly that a desirable result may be or is achieved, may be achieved. That's at A-195, 19-2-3. Second, Teva's position is belied by his failure to disclose even one actual clinically effective dose anywhere in the specification or claim. There's no clinical data. In Bristol-Myers and Copaxone, the claims recited specific clinically effective doses supported by clinical trial data. Yet this Court held that no showing of efficacy was required to invalidate them. Teva should not be entitled to a higher standard for obviousness than in those cases when Teva disclosed less and claimed less. And the third point is that Teva's argument violates claim differentiation and contradicts its specification. So mirroring... One doesn't need clinical results to support a method of treatment claim, but a broad statement of effective doses generally suffices. I think the reason that I referenced the clinical results specifically is because that's something that courts often point to in terms of construing a term like effective amount. So here you have a definition of effective amount that just requires an amount of a drug. And then in addition to that, the specification doesn't actually include any clinical data. It just has these broad statements. And so, again, that just goes to the fact that effective amount is pointing to the purpose of the drug, not a result required by the drug. And I think that, again, the Alcon versus Apotex case, which I was getting to with respect to claim differentiation, is helpful there. And there... You had a dependent claim, which recited a specific dose range, and you had an independent claim that recited an effective amount, the same setup that you have here. And in our case, just like in that case, the evidence showed that the claimed range encompassed many clinically ineffective doses. That's A3114 and A11844. And so Teva's position is that this range is just a hunting ground for future attempts to find a clinically effective amount. But that can't be squared with the principle of claim differentiation, which requires that independent claims be at least as broad as the dependent claims. So in view of the lack of express definitions, principles of claim differentiation, and the dearth of clinical data, effective amounts should not require a clinical result or elevate the standard for reasonable expectation of success. You won on the invalidation of the composition claims, but you didn't hear on the method claim. They obviously differ, and we both know all the differences. But in principle, would you say the arguments are basically the same? There's TAN and level of WANZA. And are you taking the view that basically the issues are the same? Yeah, I think generally speaking, the records in the composition and method cases are substantially similar. And I think that the different results arise from two errors in the method cases. And the first is essentially applying a reasonable expectation of success in the method cases that required additional data. For example, that someone had to follow TAN's explicit dosing directions before Teva did. And that's just legally incorrect. And I think the second is the fact findings relating to alleged uncertainty about the blood-brain barrier. And that arose by recent and relevant prior art, which is the Peterson 2005 paper. So Peterson 2005 was a human clinical paper that the board simply didn't address at all in its findings, in its analysis with respect to reasonable expectation of success. And it shows that the board is aware. In the composition claims, the reasonable expectation of success relates to humanizing it. And there was no biological result in the claim. Humanizing the antibody really has expectation of success. Here, the reasonable expectation of success relates to treatment of an ailment. That's a higher standard, isn't it? I think that it is a somewhat different standard. But I think the problem is that the claim doesn't actually require treatment. It just requires an approach for treating. The preamble doesn't require treatment. I think Teva and the board and Lilly all agree with that. And the effective amount term also doesn't actually require treatment. The claims are directed to an approach for treating. And so, again, I think that under the proper legal standard, there should be a one-to-one correlation between what the claims objectively require and the reasonable expectation analysis. I don't see the word approach in the claim. I see reducing incidence or treating a symptom. Excuse me, Your Honor. I apologize for cutting in. Go ahead. Go ahead. The specification defines the word treating as an approach for treating. So, again, it doesn't actually require a result. It's just a purpose. And Teva agrees with that. In Teva's briefing, they have agreed that it's merely an intent to treat as required by the preamble, not actually treat. If the word approach had been in the claim, it would have been rejected as indefinite. What the claim says is reducing incidence or treating. I mean, Teva's specification is unambiguous, that the claim is directed to an approach for lines 37 to 38. So the claim is directed to an approach for treating. That is what the claim is directed to. And so that's how they've defined the term. That's how they've set this up. And they would agree that the preamble does not require actual treatment. And so, again, under the proper legal standard, there should be a one-to-one correlation between what the claims objectively require and the reasonable expectation analysis. Teva's preambles require administering antibodies for the purpose of treating, not actually treating. So the only relevant question is what the record shows regarding this purpose. And as the board found, one of ordinary skill would have combined the prior art to perform the sole method step, administering antibodies, for that same purpose. That's at A102 to 103. Or as stated in the… Who would want to claim an approach? Who would want to claim an approach, even if it were definite? One claims treatment. And that's what the claim… That's what the language says. Well, I guess from the flip side, and if you look at it from an infringement perspective, it would be a lower burden if the claim was directed to an approach for treating as compared to actual treatment. So there are sort of advantages. You don't actually have to prove that the claim covers actual treatment. Well, it doesn't say approach for treatment. It says approach for obtaining beneficial or desired clinical results. And then they define what those clinical results are. And they're very specific. So they're not just saying generally thinking about treating. They're saying getting rid of these clinical problems. I think it is an approach for getting rid of those clinical problems, Your Honor. I mean, that is the way that it's defined in the specification. And Teva, Lily, and the Board all agree that the claim only requires the purpose for administering, not actually administering. So I'd like to turn now… I alluded to this earlier, but I'd like to turn to sort of what we think is a separate legal error. And that was relying on OSI pharmaceuticals to demand that the And this is independent of claim construction. So even if we assume that one needs to show reasonable expectation of success for achieving a clinical result, the Board required data. Now, Teva disputes this. And they syndicated, well, that's not actually what the Board did. But if you look at appendix pages 147 to 148, again and again, the Board says, there's no data. Olson provides no data. Tan provides no data. Covell provides no data. Olson, Tan, and Queen do not provide any data on whether administering a full-length anti-CGRP antibody would provide a beneficial or desired result. Or, and with respect to Tan, there's no evidence in the record that anyone followed Tan's suggested approach prior to filing of the patents. That's at appendix 148. That's a demand for data. Now, OSI required data due to highly unusual circumstances. The cancer field had more than failure rate. Even the most promising drugs in OSI's field invariably ended up on the scrap heap. Here, the record has no similarities. Teva identified no clinical failures of anti-CGRP drugs to the Board. The migraine field instead included several FDA-approved drugs, the triptans, Olson's Biven compound that had been successful in a Phase II trial, and even worked with- Olson was very different. I mean, the Board specifically found that Olson was completely different, didn't it? I mean, Olson involved a small molecule receptor antagonist, but the evidence shows that receptor antagonists and antibodies were understood as alternatives, so that although there were differences between the two, it's nevertheless a highly relevant teaching. And moreover, there were also evidence with aftemers, which were described in the art as analogs to antibodies. So, these were larger molecules. They were understood not to cross the blood-brain barrier. And they were being tested, and they targeted CGRP, and they were being tested in animal models for treatment of migraine. And so, the Board misapplies the reasonable expectation standard from OSI in our case. I know I'm into my rebuttal time, so unless there are any further questions- Very quickly, you say that aftemers were found not to- they were understood not to cross the blood-brain barrier? Yeah, that's correct, Gerardo. And what is your reference to that? It's the Healy reference, and it's Appendix 10814. Okay. Thank you. Now, can I show the remainder of your time? Yeah, I'd like to reserve the remainder of my time, Your Honor. Mr. Jay. Thank you, Your Honor. These patents do, in fact, claim the use of these antibodies that antagonize the ligand to treat headache and other vasopotor symptoms. That is what the claim language reaches, and that's why- that's what really was required to prove obvious. I'd like go straight to the preamble point, if I may. In this case, you have the preamble and the independent claims woven tightly together. The claims- both the independent claims and the dependent claims repeatedly referring back to the preamble to provide antecedent basis, and the cases on which Lilly relies don't have any such discussion of antecedent basis. So, I think that the strongest or the clearest example of that is the reference in Dependent Claim 3, and I'm referring here to the 045 patent, to said vasomotor symptom. The only way that you can give content to that vasomotor symptom is to refer back to the preamble, where it is referred to, the vasomotor symptom in an individual. The same thing in Dependent Claim 9, the same thing in the other patents with respect to headache. What do you- what's your response to your friend on the other side saying that, well, you don't really claim treatment of headaches, you actually just claim an approach to treatment, which I'm not even sure I completely understand, but- and he said, you concede that it's not an actual treatment that's required. We don't concede- we don't concede that, Your Honor. When you read together the meanings of either treatment or reducing incidence and effective amount, you see that what the definitions are doing is ensuring that administering an effective amount to a person with a headache or a vasomotor symptom, if they don't respond, but the purpose of administering it is to achieve the beneficial or desired clinical result, then it practices the patent, even if some individuals may not respond to it. So, if you look at a couple of things, one is at the end of the definition of reducing incidence, which, of course, is the other substantive term in the preamble here, that's at column 17 at the very bottom. So, a method of reducing incidence of headache in an individual reflects administering the antibody based on a reasonable expectation that such administration may likely cause such a reduction in incidence in that particular individual. So, in that way, both treatment and reducing incidence work together with the effective amount, which is defined, as my friend said, in an amount sufficient- an amount sufficient to affect beneficial or desired results. And what are those results? You refer back to the preamble to see what those results are. As appropriate, they would be to reduce or treat a vasomotor symptom or headache or migraine as appropriate for each of the individual claims. So, we think that not only is that textbook antecedent basis, using definite words like the and said in the body of the claims to refer back to the prior reference in the preamble, but this really is what gives life and meaning to the claim. Contrast that with Lilly's construction, which says that this is a method of administering these antibodies to anyone in any amount for any purpose. The other point that I'd like to make is how the preamble language drives what BMS calls a manipulative difference. In BMS, there was a specific amount specified in the claims, and as a result, the steps were performed the exact same way regardless of the language in the preamble. That is not the case here. There is a manipulative difference because the effective amount looks back to the preamble to figure out whether this method is being practiced to treat a vasomotor symptom or a headache, for example. Ultimately, as in Janssen, this preamble is a statement of the intentional purpose for which the method must be performed. My friends on the other side have said that, well, a statement of intentional purpose is never limiting, and that is exactly the opposite of Janssen. I think for that reason, they're attempting to get out of there. I'm sorry. Mr. Jay, ultimately, isn't this case the same as the other? We're talking about an antibody, and we're talking about treating—we're sort of carrying it further than we did. Patents carry the use of the CGRP antibody further. You've got TAN, and you've got references that talk about treating vasomotor symptoms, and why wasn't the board wrong in upholding this patent? When it invalidated the evidence? I think there are a number of differences, Your Honor. I do think that it would follow that if the board was wrong as to the composition claims, it would follow that these claims are patentable. But even if one accepted the composition holding, here are some of the differences. Number one has already brought out the difference in reasonable expectation of success. You would expect success in humanization more readily than you would expect success in treatment of an ailment, as I think you said in your question to Mr. Raich. That is true, except you have mentioned—TAN mentions success for a fragment and ways to improve success for the full material. So there's more to it than just the fact that you've got the result in the claim. So in this case, the board actually explored that the TAN optimism in a way that it did not in the other IPRs, and the same thing with the analogies from Olison and the Aptamers. So let me do TAN first. So TAN relied on CoVel, and the board here made detailed findings about CoVel and what it teaches, Appendix 109 to 111, and that wasn't addressed in the other IPRs precisely because the board thought that it only needed to address a motivation to study or use and an expectation of success in humanizing, whereas here everyone agrees that the reasonable expectation of success has to be in treatment if that's what the claims cover. So the CoVel finding addresses that with respect to TAN. The second point is on the blood-brain barrier, which is not discussed in the Composition of Matter IPRs at all, and which the board properly found that because of the vigorous debate, the differing viewpoints about the site of action and whether a therapy had to cross the blood-brain barrier, and the key finding is at page 138 of would be able to achieve success in treating migraine. The other side's response to that is this Peterson 2005 reference, which is not a full-size antibody study at all. It's a BIBN, but in any event, first of all, the board did address Peterson at 126 to 127 and said it was findings in that section, but even setting that aside, what mattered is not what Peterson said. What matters is whether there were, in fact, different viewpoints that would have led us to Larsen to conclude that the site and mechanism of action of CGRP monoclonal antibodies is unclear, and what I just said about the site and mechanism of action being unclear, the DOTIC reference that the board relied on at page 90, which is in the appendix at 22465, said exactly what I've just said in 2014. So even if you thought that the board's findings based on Levy and Fisher, which are both from 2005, were inadequate, it's quite clear from the post-priority date art that Peterson by no means settled the debate or was some kind of silver bullet with which no one could possibly disagree. There was a vigorous debate at and after the priority date about the blood-brain barrier, and that finding is not necessary to the board's conclusion, but it is absolutely sufficient to sustain the board's conclusion, and that was not an issue at all in the composition of matter appeals. Do you agree with your opposing counsel that the aptamers were understood not to cross the blood-brain barrier as of 2005? So I think that wasn't quite the question, because the question was whether-for example, the blood-brain barrier might be compromised in a person with migraine, and so the question was not whether aptamers- Whether they need to cross the blood-brain barrier, in other words, was the question. Right, that's right, and that if they did, then would the size matter between a small molecule and an aptamer and a full-size antibody? But an aptamer is a large molecule compared to the BIBN, right, and at least in the same league with a full-size antibody? I'm not sure that it's in the same league as a full-size antibody, and as I think we discussed in the first argument, the half-life of an aptamer is certainly longer than the small molecule drugs, but is significantly shorter than for an antibody. I don't have a reference about comparing them in size ready to hand, but I think that the analogy between aptamer and antibody is certainly not a perfect one. Ultimately, the question was for the board about whether the analogy between the IBN or aptamers was one that would give an expectation of success to the skilled artisan. That's exactly the point that, as I mentioned in the first argument, the board refused to reach in the composition of matter appeal and IPRs, and when it got to it in this case, it concluded at page 147 that the differences are too significant. The differences between, on the one hand, these other molecules studied in the prior art and the full-length antibodies that are claimed in these- who's used as claimed in these patents, and that doesn't rest on a demand for data. It rests on a conclusion about the differences between the, you know, for example, Olison and CLAIM-17. Olison certainly provided no data. The board made clear at footnote 75 of its decision that it understood that this court does not require data as an absolute matter. Any references to data on the pages that Mr. Raich brought up are simply pointing out the deficiencies in these references. It wasn't that these references had other teachings, but because they had no data, the board found them, per se, inadequate. The board found at 148, for example, that there was no evidence in the record that anyone had followed TAM's approach. That's not a request for data. It is pointing out that the record is silent on this point and that Lilly hadn't carried this court. Anything further, Mr. Jay? I don't think so, Your Honor. Unless the court has further questions, we're prepared to submit our case. Thank you. Mr. Raich has a little rebuttal time. Thank you, Your Honor. So just very briefly on what the claims require and how it correlates to expectation of success. The preamble terms go to the treatment purpose rather than efficacy. That's a quote from Teva's red brief at page 32, that it goes to purpose rather than efficacy. And I spent some time in my opening remarks discussing the effective amount term and how that also just says that it may be functional. It doesn't require efficacy. And so when you put the preamble, which doesn't require efficacy, and an effective amount term together that doesn't require efficacy, you don't somehow get a claim that requires a clinical result or efficacy. You get a claim that is directed towards administering an antibody for the purpose recited in the preamble. Right, but the concept would be that a broad... I mean, if you read the specification, they're talking about the fact that a broad swath of people would receive that therapeutic effect, but we can't guarantee that every person will respond exactly the same way. Well, Your Honor, I mean, the term treatment is defined as an approach for obtaining beneficial or desired results. They could have written the claim differently. Many other patents are written differently, as you all know. They could have required treatment. They could have required that effective amount means a result, but that's not the way that the claims are written. And that perhaps makes sense because you have a patent that has no clinical data in it or nothing involving administration to a human whatsoever. So, again, as in other cases like Alcon and BMS and Capaxone, no clinical result should be required by the term effective amount. I also just want to emphasize the breadth of these claims. The claims are incredibly broad. They encompass doses as low as three micrograms per kilogram, which both parties' experts agree would not be clinically effective. And so the standard should be a reasonable expectation of success as to whether a person of skill in the art could make and administer the antibody for the purpose recited in the preamble. And respectfully, that is what was shown by the record. I'd like to turn then briefly to the discussion. Please be brief, counsel. Your time has expired. All right. I will just say respectfully, with respect to the blood-brain barrier, ignoring Peterson 2005 was both a legal error because it's the most relevant study that was most recent in time. And moreover, it was a substantial evidence failure not to consider it because it was the most relevant paper using the best available clinical results. So respectfully, your honors, we respectfully request that the board reverse the judgment of the board. Thank you. Thank you, Mr. Raich. We appreciate the arguments of both counsel and the cases submitted. The honorable court is adjourned until tomorrow morning at 10 a.m.